IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 7, 2023 Session

**STATE OF TENNESSEE v. SHUNDARIUS TURNER**

**Appeal from the Criminal Court for Shelby County**
**No. 19-04531       James M. Lammey, Judge**
_____

**No. W2022-01646-CCA-R3-CD**
_____

Defendant, Shundarius Turner, was convicted by a jury of reckless homicide, especially aggravated robbery, aggravated criminal trespass, aggravated assault, and reckless endangerment. He received a total effective sentence of thirty-seven years, eleven months, and twenty-nine days. On appeal, he claims the trial court erred in excluding a photographic lineup where he was not identified by one of the victims, the evidence was insufficient to support his felony convictions, the trial court's sentencing decision violated his Fifth and Sixth Amendment rights, the trial court erred in excluding a witness from testifying on his behalf, the trial court erred in denying his right to strike a juror for cause, and the cumulative effect of these errors denied him a fair trial. Following our review of the entire record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and MATTHEW J. WILSON, J., joined.

Josie S. Holland, Memphis, Tennessee (on appeal); Patience Branham and Paul K. Prather, Jr., Memphis, Tennessee (at trial) for the appellant, Shundarius Turner.

Jonathan Skrmetti, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General and Garrett D. Ward, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Joseph F. Griffith and Austin Scofield, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Facts and Procedural History

This case arose when Defendant and Narquese White robbed and killed Dontavious Craigen during a drug transaction that occurred in the home of Charles Craigen, Dontavious Craigen's father. Also present in the home during the crimes were Charles Craigen, Ashley Fett, and Ashley Fett's two young children, D.F. and A.C. The Shelby County Grand Jury entered a true bill charging Defendant and Narquese White ("Co-defendant White") of first degree murder of Dontavious Craigen (count one), especially aggravated robbery (count two), attempted first degree murder of Charles Craigen (count three), aggravated burglary (count four), employing a firearm during the commission of attempted first degree murder (count five), employing a firearm during the commission of aggravated burglary (count six), aggravated assault (count seven), and reckless endangerment (count eight). Defendant and Co-defendant White were tried together.

*Voir Dire*

During voir dire, after several rounds of peremptory challenges, the State lodged a reverse *Batson*[1] challenge arguing that the defense had "systematically struck" Caucasian women:

> I might be off by maybe one here but it appears that every white woman is being systematically struck off this jury. I think of [twelve] struck by the defense, [eleven] people have been white. I'd like to know the reasons.

Defendant had just moved to strike Juror 4. The trial court asked Defendant's counsel for a race-neutral reason for striking her. Defendant's counsel replied: "Well she just seemed too smug to me. She's been on so many juries and I'm – I didn't have a good rapport with her and I just didn't want to go – ." Defendant's counsel maintained that the decision to strike her was not based on race and pointed out that the defense had "also struck black women too." The trial court instructed the venire to exit the courtroom so a fuller discussion could be had. The State repeated its objection:

> It appeared to me like the Caucasian women were systematically being struck from the jury. In counting up the [twelve], two, four, six, eight, ten, [twelve] strikes I believe made by the defense. In counting nine of them are Caucasian people. And it seems like the last few rounds it's been systematically going through the Caucasian women. And I just want a race-neutral reason.

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

Defendant's counsel stated that she lacked a "connection" with Juror 4 who she found to be "hostile" and not entirely honest. The trial court noted a pattern by the defense of "one at a time knocking of white women," and found Defendant's reasons not to be race-neutral. However, the court nonetheless permitted Defendant to strike Juror 4.

Shortly after Juror 4 was excused, Defense counsel requested a bench conference and moved to strike Juror 10 stating, "[Defendant] has made a request that I get rid of number ten which is another female white. And we noticed that and I'm duty bound to represent my client." When asked for a race-neutral reason, Defense counsel replied, "[Defendant] just thinks that she's hostile." The trial court denied the challenge to Juror 10 and announced that the fourteen people seated in the jury box would serve as jurors in the case. After the jury was excused, the trial court observed the makeup of the jury and addressed once again, Defendant's request to strike Juror 10:

> [A]lmost every female white was excluded. Now that's presupposing I suppose on [Defendant]'s behalf that being a white person, you can't be fair and impartial, which he needs to understand that they have a constitutional right to be here and just because they're white doesn't mean that they are going to discriminate against him. Just like the blacks that are on the jury are not going to discriminate against the State of Tennessee or anything like that. They're going to swear an oath, follow the law, and be fair and impartial.
>
> And so he needs to understand that there was no race neutral basis to challenge her other than the fact that she was a female white. And that is against all ethical considerations and therefore, I denied the request and I noted your exception to that, [Defense counsel].

A review of the voir dire transcript shows that Juror 10 was an accountant and had never before served on a jury. Under oath, Juror 10 confirmed that she could follow the law and be fair and impartial. She denied that there was "anything in [her] background" the parties should know about her before examining the next prospective juror.

*Trial*

On July 18, 2017, after working a twelve-hour shift, Charles Craigen went to his home located at 1440 Wilson in Memphis, after 2:00 p.m. He was met by his son,

Dontavious Craigen, his son's fiancée, Ashley Fett, and their two sons, D.F. and A.C.[2] Dontavious did not live with Charles but was often at his home. Both Dontavious and Ms. Fett were talking separately on their phones. According to Charles, Dontavious stepped outside to continue his call while Ms. Fett remained inside. Charles played a little bit with D.F. and A.C. before going to his room to lie down. Before lying down, he looked outside his window and saw Dontavious talking to "some dude outside." He paid them no attention because they appeared to be "up to no good." Charles saw a "type of gray car" parked to the left of his neighbor's driveway. Although his neighbor had a gray car, Charles did not recognize this gray car and knew it did not belong to his neighbor. Charles testified that he saw only one person outside with Dontavious.

Charles awoke about sixteen minutes later when he heard a gunshot and Ms. Fett yelling. Charles ran out of his bedroom and saw Dontavious push a man out the front door. Charles returned to his bedroom and grabbed a .308 caliber long rifle from a closet and loaded it. As he ran down the hallway, he saw a man in his peripheral vision. At trial, Charles described this man as a "dark-skinned black guy" ("first gunman") and not the same man Dontavious was pushing out the front door moments earlier. Charles testified that when he heard "a clip [go] off," he looked to the side, and saw the first gunman point a gun at him. Charles fired off one round before the first gunman shot him in the hand. Charles backed into the hallway and out of firing range and saw the first gunman run out the door of his home. Charles yelled at Ms. Fett to run to the back of the house with her two children. He looked in a drawer for a pistol, but it was not there.

Charles wrapped up his hand with a robe because it was bleeding "pretty bad," and "running off adrenaline," he ran back into the hallway where he was confronted by a different man. According to Charles, this man was "bright[-]skinned" and of lighter complexion than the first gunman. The "bright[-]skinned man" ("second gunman") dropped to his knee and fired "nineteen to thirty" shots at Charles with a rifle. Charles felt a bullet lodge in his other hand and another bullet hit him in the leg.

Once it was clear that the two gunmen had cleared out of his house, Charles limped outside to look for Dontavious. The gray car he had seen earlier was no longer parked next to his neighbor's driveway. Charles then saw Dontavious on the ground behind Charles's truck.

Charles confirmed that he was shot three times by two different men. He clarified that the second gunman was not inside the house but had fired at him through the opened

_____

[2] Since both victims share the same last name, to avoid confusion, we will refer to Dontavious Craigen and Charles Craigen by their first names. No disrespect is intended. In addition, we will refer to the minor age victims by their initials consistent with this court's policy.

front door. In terms of his injuries, Charles testified that both his pinky and his ring finger had been blown off, and his middle finger was hanging by a thin piece of skin when the paramedics arrived. He underwent seven surgeries to preserve the hand but ultimately it could not be preserved, and Charles made the decision to have it amputated.[3] Charles spent two to three weeks in the hospital and was then discharged so he could attend his son's funeral. Charles testified that the rifle he used belonged to Dontavious who had brought it to Charles's house only three days before the shooting. Charles learned later that Dontavious was involved in a drug deal that had gone "bad." He testified that he was unaware that Dontavious was selling drugs out of his house.

On cross-examination, Charles denied seeing marijuana or a gun on the table in the front room when he came home from work that day. He admitted to smoking "a little marijuana," but denied that the marijuana later found in his dryer was his; he insisted that it belonged to Dontavious. Charles denied that he sold drugs and that his house was a "traphouse" for drugs.

Charles confirmed that he had dated a woman named Angela Lawson a couple of years before the trial. Ms. Lawson was not in the house during the shooting but came by afterward. He denied that he shot Dontavious in the back with the rifle. Charles had never seen the two gunmen before and could not identify them afterward.

On cross-examination by Co-defendant White's counsel, Charles estimated that the first gunman stood four to five feet away when he fired his gun whereas the second gunman was further away at ten to twelve feet. Charles told the police that he believed the first gunman shot him with a rifle because the single shot "tore his hand off," and he knew of no "regular little handgun" able to do that. He also thought the gunman had fired a rifle based on the sound of the gunshot. Charles testified that he managed to fire only one shot inside the house while Dontavious was outside.

Robert Brownlee lived next door to Charles on the day of the shootings. Mr. Brownlee testified that he was in the back bedroom between 2:00 and 4:00 in the afternoon when he heard five or six gunshots which sounded as if they were being fired in the front of Charles's house and sounded like they were shot from a "large weapon." Mr. Brownlee looked out his living room window and saw "a young man with a[n] assault rifle" get into the passenger side of a gray Infiniti which was parked in Mr. Brownlee's driveway. He had never seen this man before the day of the shooting. He described the man he saw as taller than him, around six feet, and of a darker complexion. Mr. Brownlee went to his bedroom in the back of the house and by the time he returned, the Infiniti was no longer

---

[3] Charles did not identify which hand was later amputated.

parked in his driveway. Mr. Brownlee dialed 911, and the recording of that call was played at trial. Mr. Brownlee told the dispatcher that his next-door neighbor was "robbed" and that the suspect was in a gray Infiniti.

Robin Bass, a retired officer from the Memphis Police Department ("MPD"), was a patrol officer at the time of the shootings and testified to what he observed, photographed, and marked for collection as evidence at the scene. Those photographs were exhibited to the jury during his testimony. His testimony was focused on the ballistics evidence found at the scene. Officer Bass observed Dontavious's body on the edge of the street. Next to his body was a cell phone and three plastic bags containing a substance later identified as marijuana.

Inside the house, Officer Bass found bags of marijuana in a closet adjacent to the living room and the back bedroom. A .308 caliber rifle was in the hallway and a severed finger was found on the dining room table next to more drugs. Officer Bass displayed the .308 rifle to the jury and explained that the rifle was "torn open" exposing the bullets inside which were made of brass.

Officer Bass explained that a spent shell casing is a bullet that has been fired as opposed to a live round which has not been fired. Officer Bass found only one brass .308 spent casing and no pistol rounds. The rest of the fired casings were 7.62 by 39-millimeter. Officer Bass testified that the two bullets are "different" in size. He was unaware whether the two bullets could be fired from the same weapon, like a .308 rifle. He found nine spent shell casings in the house, four in the living room, and two near the entrance of the house. Along with the spent casings, there were bullet fragments and bullet strikes along the hallway to the back of the house. Officer Bass observed 7.62 by 39-millimeter shell casings in the driveway and throughout the house.

Officer Bass found a substance appearing to be blood on the outside of the front door. He testified that there were no bullet holes or bullet defects in the front door or the front of the house. The front door consisted of a steel frame with glass behind it and the glass was still intact.

The State's next witness, Ms. Fett, was unavailable for trial because she died in 2021. Before she died, Ms. Fett testified at Co-defendant White's preliminary hearing on October 5, 2017, and at Defendant's preliminary hearing on March 13, 2019. By agreement of the parties and order of the trial court, audio recordings of Ms. Fett's testimony from the preliminary hearings were played at trial, and transcripts of the same were distributed to the jury as substantive evidence. *See* Tenn. R. Evid. 804(b)(1).

At Co-defendant White's preliminary hearing, Ms. Fett testified that she went to her "father-in-law's" house on July 18, 2017, around three in the afternoon, with her boyfriend, Dontavious, and her two children. She referred to Charles as her "father-in-law" or "Pop." The four of them settled in Charles's house "like we normally do." Her older child "instantly" began playing a game "like he always does" in the living room. Ms. Fett explained that she normally took her younger child, then an infant, to the back of the house, but that day she kept him in the living room with her and her older child. Ms. Fett sat next to her older child as she talked on her phone to her grandmother about getting her car insured. She also chatted with Charles before he went to the back of the house to rest.

As she talked to her grandmother, Ms. Fett noticed that Dontavious had company. She observed visitors coming in and out of the house several times. When the visitors left, Charles came to the living room and said, "I don't trust these boys. Something is not right here," and returned to his bedroom. Ms. Fett then ended her call with her grandmother and "started to pay attention." She observed Dontavious re-enter the house with a "light-skinned guy" who she identified as Co-defendant White. She testified that she made eye contact with Co-defendant White "for about [five] seconds." She saw the two men speaking, but she was not sure what was being said. Ms. Fett acknowledged that Co-defendant White was at the house to buy marijuana from Dontavious. She had seen the marijuana on the "table in front of them."

Dontavious walked Co-defendant White out of the house and returned with "a dark-skinned guy."[4] They likewise had a short conversation by the table. Dontavious walked Defendant out of the house and returned again with Co-defendant White. As they were talking, Ms. Fett heard the screen door open as Defendant tried to enter the house. Dontavious confronted Defendant and told him, as he shut the screen door on him, "Both of you guys can't be in here at the same time." Dontavious returned to the table and continued talking to Co-defendant White. Ms. Fett heard the screen door open again and saw Defendant force his way into the house. Ms. Fett screamed, "someone is coming in the house." Dontavious pushed Defendant out of the house and the two of them ended up outside. Ms. Fett then saw Co-defendant White take a gun out of his bag and fire it "outside the door a few times."

Ms. Fett testified that Co-defendant White then fired his gun inside the house a few times. Charles was still in his bedroom; Ms. Fett and her two children were in the living room. Co-defendant White pointed the gun at Ms. Fett's infant son and then pointed the gun at Ms. Fett and her older son. Ms. Fett shielded her older son with her body and hid

---

[4] Ms. Fett was not asked to identify the "dark-skinned" man by name and did not offer his name during her testimony at Co-defendant White's preliminary hearing. However, because she later identified this man as Defendant at his preliminary hearing, we will refer to him as Defendant for the purpose of summarizing her testimony.

her face because she believed they were going to be shot. Co-defendant White ducked behind the infant car seat and began taking things off the table and putting them in his backpack. Charles then ran from his bedroom to the front of the house with a gun and fired it outside of the house. Co-defendant White jumped from his hiding place behind the car seat, shot at Charles, and then ran outside the house.

When Co-defendant White ran outside, Ms. Fett "thought it was a perfect opportunity" for her to hide in the back of the house. She grabbed both of her children and ran down the hallway to the back of the house. She heard gunshots as she ran down the hall and felt bullets "scrap[e]" her legs. She testified that she still had the pants she was wearing that afternoon and they had bullet holes in them. She ran to Charles's bedroom to hide her children. Because she was unable to put both children under the bed, she ran to the bathroom where they hid in the tub. She continued to hear gunshots. She then heard Charles cry out to her that he had been shot. She instructed her older child to remain in the tub with the baby and said that she would return. Ms. Fett ran to Charles who told her to call the police. She used some towels to wrap Charles's arm as she talked to the 911 dispatcher. She took turns running to the back of the house to check on her children and to the front of the house to take care of Charles. Ms. Fett asked where Dontavious was. She and Charles thought the two men may have kidnapped Dontavious.

Ms. Fett looked at the driveway and saw two young women who appeared to be "in shock" at something on the street. Ms. Fett immediately ran over and saw Dontavious on the ground. He was still alive but could not speak. She found a pulse. She believed Dontavious had been shot in the face because there was so much blood coming out of his nose and mouth. She applied pressure to his wounds to stop the bleeding. After paramedics arrived and flipped him over, she saw that he had been shot in the back. Ms. Fett maintained that Co-defendant White and the "dark-skinned" man were together.

On cross-examination, Ms. Fett confirmed that Dontavious "got into it physically" with Defendant and pushed him out of house when he tried to force his way inside. The two men ended up outside. Ms. Fett did not see who shot Dontavious. She clarified that she saw Co-defendant White shoot Charles. She denied that either man pulled a weapon on Dontavious while they were talking to Dontavious during the "drug transaction."

Ms. Fett maintained that she was unaware that a drug transaction was planned for that afternoon at Charles's house. Although she knew Dontavious was a drug dealer, she testified that he never sold drugs "in front of [her] and [her] son[]s." She denied that he had a weapon and was unaware that he kept a gun in the back of Charles's house. She testified that the incident lasted about five minutes. She was about five feet away from Co-defendant White and the same amount of distance from the Defendant.

Ms. Fett's testimony at Defendant's preliminary hearing was heard next. Her testimony at that hearing was similar to her testimony at Co-defendant White's preliminary hearing in terms of what had occurred. Ms. Fett explained that she was on the phone with several insurance companies trying to get her new car insured. Dontavious was also on the phone, but he soon had a visitor, and the two were engaged in "some transactions." She was not paying much attention but recalled a man "come in and out of the house" three or four times. She testified that they looked at each other. She observed that the man was looking around the living room where she was with her two children. She identified Defendant as the man in the living room.

Charles came to the front of the house after Defendant exited the house for the third or fourth time. Charles told Ms. Fett that he saw one of the men with a gun but he did not identify which man. Ms. Fett then got off the phone, and Dontavious entered the house with Co-defendant White. She testified that Co-defendant White looked around the house as soon as he entered as if to "scope" the house. She made "direct eye contact" with him.

Co-defendant White came in and out of the house like Defendant had done. When Defendant tried to enter the house while Co-defendant White was inside, Dontavious stopped him and told him that he could not come inside at the same time as Co-defendant White. Dontavious shut the door behind him but Defendant tried to "barge" into the house. Ms. Fett screamed at Dontavious that Defendant was trying to come inside the house. Defendant and Dontavious "tussled" at the door, and the two took the fight outside the house.

Co-defendant White pulled a gun "from his back" and fired it three times in the house. He pointed his gun at Ms. Fett's infant son who was in his car seat. Ms. Fett grabbed her older child because he was closer to her and shielded him with her body and hid her face. She testified that Co-defendant White did not shoot at them but instead grabbed everything off the dining table which was primarily the marijuana.

At that point, Charles exited his bedroom with a gun aimed at the door. Co-defendant White, who had hidden behind the infant car seat, shot Charles in the hand and fired his gun a couple of more times in the house before exiting. When Co-defendant White left, she took her children and ran to Charles's bedroom located in the back of the house. She continued to hear gunshots as they ran down the hallway. She testified that the pants she was wearing that day had bullet holes in them. Because her infant son was still in the car seat, she could not hide the children under the bed. As she went around the bed to take her baby out of the car seat, she heard someone coming down the hallway. She grabbed her children and hid in the bathroom tub. She testified that she heard "so many gunshots" while in the tub.

When the shooting finally stopped, she heard Charles cry out to her because he had been shot. Ms. Fett came out of the bathroom and wrapped Charles's arm with several towels. Charles instructed her to dial 911. Charles managed to stumble to the front of the house. Ms. Fett asked him where Dontavious was and looked outside and saw two women in the driveway with a "devastated" expression on their faces. Ms. Fett went to them and saw Dontavious on the ground. Ms. Fett was still on the phone with the dispatcher as she knelt down next to Dontavious and felt his neck for a pulse. She felt a slight pulse on his wrist. She tried to talk to him while also talking to the dispatcher. She tried applying pressure to his wounds as instructed until the ambulance arrived. His pulse was gone when the ambulance arrived. Dontavious could not be revived by a defibrillator and was announced dead at the scene.

According to Ms. Fett, Defendant and Co-defendant White came to the house together although she did not see the vehicle they arrived in. She testified that she did not see Defendant with a gun. On cross-examination, Ms. Fett said she believed that Defendant and Co-defendant White were together because she heard Dontavious tell Defendant, "You saw it, you know what it looks like. He doesn't have to come in." She had never seen Defendant before that afternoon and could not provide his name to the police at the scene but did give a description.

| | |
|---|---|
| Defense Counsel: | You've talked about [Defendant]. You even called him by his first name. Did you know him before this thing happened? |
| Ms. Fett: | No[.] |
| Defense counsel: | Ever seen him before in your life? |
| Ms. Fett: | No[.] |
| Defense counsel: | So you are calling him by that name because I guess, tell me if I'm wrong you've sort of learned he's the name of one of these people charged? |
| Ms. Fett: | Yes, I saw his face and a name was put to his face, yes. |
| Defense counsel: | After this happened you didn't say to the police [Defendant] is one of these guys. You didn't say that? |
| Ms. Fett: | No. |

| | |
|---|---|
| Defense counsel: | Because you didn't know who he was? |
| Ms. Fett: | Correct. |
| Defense counsel: | How did you learn who he was? |
| Ms. Fett: | I saw him. I described him to the police on the scene. |
| Defense counsel: | You gave a description to the police? |

She described Defendant as a "petite kind of guy, not tall, couple of tattoos" on top of his hands. In the midst of playing the recording of Ms. Fett's testimony, the State stopped the recording and moved to have Defendant display his hands to the jury. The trial court granted the motion over Defendant's objection. After Defendant complied, the State played the remainder of Ms. Fett's testimony.

Ms. Fett went to the homicide office three to four weeks after the incident to talk to the police. She was shown "about a dozen photographs" of different people and asked to pick out the suspects, if they were among the photographs. Ms. Fett testified that she identified Defendant as follows:

| | |
|---|---|
| Defense counsel: | Did you identify a photo of [Defendant]? |
| Ms. Fett: | Yes. |
| Defense counsel: | Was it a big photo, by itself, or how was it distributed to you? |
| Ms. Fett: | Just small. A bunch of I guess 4x4 photos. |
| Defense counsel: | Was it with other photos? Or was it by itself? |
| Ms. Fett: | Yes, maybe about three at the top, three at the bottom of different people. |
| Defense counsel: | You were able to identify this individual? |
| Ms. Fett: | Yes. |

No further questions were asked about the photo identification. Ms. Fett was asked "how long" she had a chance to see Defendant since she testified that she was not paying

attention. She testified that she saw Defendant about "ten minutes, fifteen at the most" when he was coming in and out of the house and about thirty seconds when he was trying to force his way into Charles's house. Defendant was not wearing a head covering, hooded sweatshirt, or a mask covering his face. According to Ms. Fett, he had a "low haircut" and had no facial hair.

Ms. Fett testified that Dontavious had a handgun which she saw on the table with the marijuana on the day of the crimes. She did not know what happened to Dontavious's gun but reiterated that Co-defendant White grabbed things off the table as he hid behind her baby's car seat. She did not see Co-defendant White specifically grab Dontavious's gun, but it was not there after he ran out of the house. Ms. Fett did not see Defendant and Co-defendant White talk to each other or see what type of vehicle they arrived in. She did not see who shot Dontavious.

During the trial, the State moved to admit two photo lineups and three Facebook images and was prepared to call a witness to testify how Ms. Fett was shown the lineups. One lineup contained a photo of Co-defendant White ("lineup #1") and the other contained a photo of Defendant ("lineup #2"). Ms. Fett identified Co-defendant White in lineup #1 but did not identify anyone in lineup #2. Ms. Fett returned to the police station two days later and brought with her three Facebook images of Defendant who she identified as one of the culprits. She stated that the man who closely resembled Defendant in lineup #2 was "a little too light skinned." She believed Defendant was of a darker complexion in real life and did not want to choose the wrong person at that time.

The State argued that the lineups and the Facebook images were admissible as prior identification and non-identification made by a witness who had previously testified under oath. Defendant objected and moved to admit only lineup #2 where Ms. Fett failed to identify him. Defendant objected to the Facebook images of him, arguing that because Ms. Fett did not refer to them in her testimony at the preliminary hearing, the admission of the images would violate his right of confrontation. He also argued that the Facebook images had not been authenticated. The trial court noted that Ms. Fett's failure to identify Defendant in the lineup could "inure to [Defendant's] benefit" because he could argue that her identification of Defendant was based on what she saw on Facebook and not in the photo lineup.

The trial court looked at the images taken from Facebook provided by Ms. Fett and stated:

I'm looking at a single shot and I'm looking at a shot with two people in it and the one she indicates is the – is one of the perpetrators that apparently she provided to the police at the same date and the same time indicating this

- 12 -

is what was written on it. ["]He was the guy who was trying to bomb (sic) rush into the house and shot [] fire[] outside. I was looking on Facebook and ran across a familiar face. I clicked on his page and saw him. I provide this information to, the police. Ashley Fett. August 15 of '17. 10:53 a.m.["]

The trial court and the parties referred to Ms. Fett's preliminary hearing testimony to review how she identified Defendant. There was no dispute that Ms. Fett never mentioned "Facebook" or that she provided photos to the police. A review of her testimony revealed that she recalled identifying Defendant in "a photo." There was no distinction between the photos she saw on Facebook and the photos in the six-person lineup she examined at the homicide office. Based on her testimony, the trial court determined that that it would "only be fair" to introduce the Facebook images along with the lineups and stated, in relevant part:

> But [preliminary hearing counsel] specifically asked did you identify the photo of [Defendant] and [Ms. Fett] goes yeah. That's exactly what happened so, I mean, to say that didn't happen can't be true. And so now she – so – you know, if you want this in there then I think it's only fair that they put that in.

***

> Because she obviously didn't base it upon [the lineup]. She based it upon the photos that she herself found on Facebook. And then you can argue well she really she saw some guy on Facebook she said looked familiar but, you know, that's what she based her – you can make that argument. But you can't make that argument unless those photographs are in evidence.

The State and defense counsel agreed based on the trial court's observations that the photo lineups and the Facebook photos should not come in. The State then chose not to call the witness to testify about the photo lineups and the Facebook images and rested its case. The trial court clarified what had just occurred regarding the photo lineups and the Facebook images:

> Let's make sure the record is clear about these – this prior photospread. In the record is the testimony of [Ms. Fett] from two separate [p]reliminary hearings, one on [Co-defendant] White and one on [Defendant]. Now no mention of a photospread or anything like that in [Co-defendant White]'s preliminary hearing on 10/5 of '17 and there is a photospread that she saw where she apparently from what I gathered, she identifies [Co-defendant] White in the photospread.

- 13 -

And – now there is sworn testimony on 3/13 of '19 on [Defendant's] preliminary hearing that she saw a bunch of photos and that she could identify them, meaning both. Okay.

So I think there's probably enough evidence to justify putting in the photospread of [Co-defendant] White, however, she failed to make a[n] identification of [Defendant] in the photospread. And the preliminary hearing on [Defendant]'s case, it's not clear whether she based it upon the photospread or another single photo because it does mention a single photo a couple times so I think my feeling was is if that – the blank (sic) where she doesn't make an identification were to come in that the State should be allowed to put in the other photos that she actually based her identification on. 'Cause that's – completes the whole thing.

In light of all that, I guess the defense and the State have agreed that none of these photospreads are going to come in and there's not going to be any mention of them, okay, in order to rectify the situation. Obviously, it really inures to [Co-defendant] White's benefit because she does pick him out and does have a paragraph explaining everything that he did. So it does inure to his benefit but it – it would have been problematic for the State to put in [Co-defendant] White's and not [Defendant]'s. So they have elected to not put anything in.

The trial court added that "there is enough in the record to justify [Co-defendant] White's [lineup] but the State has elected not to put in any of it. And the defense, of course, [Defendant] is satisfied with that."

The defense stipulated to the expertise of witness, Heath Stewart, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Agent Stewart conducted a forensic extraction of the data in Dontavious's cell phone and extracted text messages relevant to the case to and from Dontavious to a contact identified as "Shun Money." Pursuant to a court-ordered subpoena, Agent Stewart obtained the subscriber information of the number connected to "Shun Money" from T-Mobile. The subscriber information showed that the number belonged to Defendant. Defendant canceled the account on July 21, 2017.

Agent Stewart took photographs of the text messages which were displayed to the jury in chronological order. He testified that the text messages suggested that Defendant and Dontavious were discussing the sale of marijuana. Agent Stewart explained that illegal drug transactions are conducted in slang, not normal language. Agent Stewart had gained

knowledge of street slang signifying drug transactions in his experience as an ATF agent and with the Drug Enforcement Administration.

Agent Stewart testified that on June 10, 2017, Dontavious texted Defendant, "Bussing these joint down Ima call yu soon as I weigh everything."[5] He also dropped a pin on his location. Defendant responded that he was seven minutes away. Agent Stewart explained that "joint" may have been "misspelled" or autocorrected by the cell phone for the word "junt" which is a common term in in the illegal drug world to reference quantity such as a pound. According to Agent Stewart, Dontavious's text about "bussing these joint down" indicated that he was breaking down the marijuana which is not uncommon for a seller to do from a bulk quantity. Defendant later asked Dontavious if he has "another 2 junts now," meaning "do you have two more pounds." Defendant and Dontavious continued to text each other on July 18, 2017.

Agent Stewart testified that the series of text messages indicated that Defendant had previously purchased marijuana from Dontavious at Charles's house. The text messages showed that Defendant and Dontavious would meet at Charles's house for the drug buys. For instance, on June 14, Dontavious asked Defendant if he "still want that junt" or if he still wanted the pound. Dontavious provided an address: 1440 Wilson. Defendant asked whose "spot" or place it was and Dontavious responded that it was his "dad's house and mine as well."

The text message history showed that a dispute had developed between Dontavious and Defendant. On July 8, 2017, Defendant texted that he had been shortchanged four ounces of marijuana. Defendant had purchased two pounds from Dontavious but each pound was short two ounces. According to Agent Stewart, two ounces of marijuana from a sixteen-ounce purchase was a "decent amount missing." Agent Stewart explained however that short-changing occurs "very frequently" in the illegal drug trade. In the following days, Defendant texted Dontavious about getting his money back for the shortage. Agent Stewart read into the record the following two text messages from Defendant:

Saynomo on jesus soul im missn 4

Ion even make this lil ass dope a problem cuz im a 100 a n**** but this s*** short I can at least get 400 bak n ill take da lil 400 lose ill just break even

Least throw a n**** 3 bak

---

[5] The text messages will be quoted as provided in the record.

Agent Stewart explained that Defendant was trying to negotiate to get some money back so he could break even. Agent Stewart testified that a dealer does not "make a fortune unless you're selling large amounts." Five days later, on July 13, Defendant referenced again the missing four ounces: "I paid fa 16 zips not 14." Agent Stewart explained that "zips" is a street term for an ounce of a controlled substance. On the day of the crimes, Defendant once again brought up how he was shortchanged: "I cant do s*** wit 2 zip I need da 4 I missn n okok saynomo." Agent Stewart did not discuss Dontavious's responses but to the previous text, Dontavious replied: "On some real p shyt ion think they gone give you four cause they barely believe you was short that mane zips and shyt I can't say it was cause you had it to."

The final text message shown to the jury was sent on the day of the crimes, July 18, 2017, at 3:08 p.m. It began with Defendant asking Dontavious where he was. Dontavious responded that he was about to head to "the trap" and would be there in twenty minutes. Agent Stewart explained that "trap" is a street term for a house where drugs are sold. Eventually Dontavious told Defendant that he was "waiting on [him]." Defendant asked for the address and Dontavious texted back: 1440 Wilson. Dontavious texted that he was "otw" or on the way and would be there in about "15." At 4:41 p.m., Defendant texted, "out" to suggest that he had arrived and was outside.

On cross-examination, Agent Stewart confirmed that Defendant and Dontavious had texted each other before June 10, 2017, and the text message records demonstrated that they knew each other from dealing drugs. He was asked about the text exchange on July 13, 2017. Agent Stewart testified that Dontavious was telling Defendant that his source was "shaky" because he had lost a shipment in the mail. Defendant continued to do business with Dontavious after he had been shortchanged on a recent purchase.

Deputy Bruce Boaz of the Shelby County Sheriff's Office was asked to examine a traffic ticket that was issued on June 17, 2017. Deputy Boaz testified that the ticket was written by his training officer, but he was in the patrol car when the ticket was issued. The ticket was for speeding; the driver was identified as Defendant. He was driving an Infiniti G37. On cross-examination, Deputy Boaz acknowledged that he did not have independent recollection of having issued the ticket. It was revealed during a bench conference on the admission of the ticket that the ticket did not identify the color of the car.

Kasia Lynch, an agent in the firearms identification unit of the Tennessee Bureau of Identification, testified without objection as an expert in firearms identification. Special Agent Lynch tested a .308 caliber Winchester rifle, thirteen 7.62 by 39-millimeter cartridge cases, and a .308 Winchester cartridge case collected at 1440 Wilson Avenue. Special Agent Lynch compared the .308 caliber Winchester casing to the .308 Winchester caliber rifle and determined that the casing was fired from the rifle. As for the 7.62 by 39-

millimeter caliber cartridge casings, Special Agent Lynch testified that they looked as if they were fired from a correct caliber firearm. She explained that the cartridge casing for a .308 Winchester is "significantly different" from the cartridge case of a 7.62 by 39-millimeter cartridge case. The latter is "much shorter" than the .308 Winchester, meaning that "although in theory" one can shoot a smaller cartridge case in a bigger gun, doing so would create distinctive markings on the cartridge case showing that it was fired from a wrong caliber gun. She had fired a caliber cartridge in a wrong caliber weapon. The first round fired, but the second round "dismantled the gun." In this case, the thirteen 7.62 by 39-millimeter cartridge cases lacked physical defects, suggesting that they had been fired from a correct caliber firearm. She testified further that she would not have expected thirteen cartridge cases to be fired from a mismatched caliber weapon. She acknowledged however, that she could not conclusively say that the 7.62 by 39-millimeter cartridge cases were fired from the same gun or two different guns.

An autopsy revealed that Dontavious was shot in the back of his left shoulder. The bullet traveled through the shoulder blade, the scapula, entered his left chest cavity through a rib, and severed his aorta and was the fatal wound. The bullet also penetrated the trachea, multiple locations of the right lung, and exited the body through the right chest cavity. The gunshot wound was of indeterminate range. No stippling or soot was found near the entrance wound, which is commonly associated with one being shot at close range. However, it was possible that "intermediary targets" such as clothing may have masked the soot or stipple from the gunpowder. Dontavious's cause of death was a gunshot wound; the manner of his death was ruled a homicide.

Neither Defendant nor Co-defendant White testified. Co-defendant White did not call any witnesses, but Defendant called Lieutenant Adam Pickering who assisted the homicide bureau in searching Charles's house on July 18, 2017. Lieutenant Pickering testified that he saw several bags of what appeared to be marijuana, three bags in a bedroom closet, a bag in the dryer, and several small bags on the table next to a severed finger. He also saw one weapon.

Based on the evidence, the jury convicted Defendant of the lesser included offense of reckless homicide of Dontavious in count one, especially aggravated robbery as charged in count two, the lesser included offense of aggravated criminal trespass in count four, aggravated assault as charged in count seven, and reckless endangerment as charged in count eight. The jury acquitted Defendant of the remaining three counts: attempted first degree murder of Charles charged in count three, and the two employing a firearm charges charged in counts five and six. The jury acquitted Co-defendant White of all eight counts.

*Sentencing*

Neither the State nor Defendant put on any proof. The State argued for the maximum sentence on each count and moved for consecutive alignment of all five sentences on the grounds that Defendant was a dangerous offender whose behavior indicated little or no regard for human life, and he had no hesitation about committing a crime where the risk to human life was high. *See* T.C.A. § 40-35-115(b)(6). The State also filed a motion for the application of four enhancement factors: the offense involved more than one victim, Defendant possessed or employed a firearm during the commission of the offense, Defendant had no hesitation in committing crimes where the risk to human life was high, and during the commission of the felony, Defendant intentionally inflicted serious bodily injury upon a person, other than the intended victim. *Id.* § 40-35-114(3), (9), (10), (12). The defense argued for concurrent sentencing and sentences at the low end of the range based on Defendant's lack of a prior criminal record. Defense counsel described the case as "weird" with no clear understanding of "what the jury did."

In discussing the enhancement factors, the trial court stated:

> First of all, the enhancement factors have to be proved by a preponderance of the evidence. And although the jury had acquitted the defendant of first degree murder, I find by a preponderance of the evidence he's actually guilty of first degree murder. It's just impossible to say that he went there with the intent to rob, and a death ensues and the person he went there to rob is killed during this event.

The trial court ultimately applied six enhancement factors and no mitigating factors in determining the length of Defendant's sentences. Specifically, because Defendant had purchased marijuana from Dontavious "on numerous occasions," the trial court found that Defendant had a history of criminal activity. *Id.* § 40-35-114(1). However, the trial court did "not put a lot of weight" on enhancement factor one. The trial court found that Defendant was a leader in the commission of an offense involving two or more criminal actors, *id.* § 40-35-114(2), and that Defendant employed a firearm, *id.* § 40-35-114(9), but applied this enhancement factor only to the reckless homicide conviction.

As for the remaining three enhancement factors, the trial court concluded that the evidence showed by a preponderance that Defendant committed crimes involving more than one victim, *id.* § 40-35-114(3), but that this factor did not apply to convictions identifying a specific victim. The trial court found the personal injury inflicted on Charles was "particularly great" as contemplated in enhancement factor six, Defendant intentionally inflicted "serious bodily injury" on Charles as provided in factor twelve, and Defendant had no hesitation in committing crimes where the risk to human life was high

as evidenced again by Charles's hand being "blown off" and the presence of over twenty shell casings in Charles's house as set forth in factor ten. *Id.* § 40-35-114(6), (10), (12).

Like enhancement factor nine, the trial court did not apply enhancement factor six to the especially aggravated robbery conviction or the aggravated assault conviction because serious injury was an element of both offenses. The trial court also found that enhancement factor six did not apply to the reckless endangerment conviction involving the children because they had not sustained injuries as contemplated by the statute. The trial court sentenced Defendant to the maximum sentence in the range for reckless homicide and especially aggravated robbery:

> It appears to be all the things that would apply. So in light of all that, it just appears to me that giving the minimum on any of these charges in light of the fact that so many of these [enhancement factors] apply, the proper sentence on the reckless homicide would be four years.
>
> Especially aggravated robbery I find that because of the facts of this case and the factors that apply, as I said, and the tremendous break that the jury gave [D]efendant, having found him guilty of especially aggravated robbery but not guilty of murder in the perpetration of especially aggravated robbery, I believe. And in light of the fact that so many of these factors apply, the [twenty-five] years is appropriate.

The trial court imposed eleven months, twenty-nine days for aggravated criminal trespass, six years for aggravated assault, and two years for reckless endangerment with the twenty-five-year sentence for the especially aggravated robbery conviction to be served at 100% by operation of law, and the remaining felony sentences to be served at 30%.

The trial court ran each four-year sentences consecutively on the grounds that Defendant was a dangerous offender. The trial court made its findings as follows:

> One, the circumstances surrounding the commission of the offense are aggravated. I don't see how anyone could look at this offense and see that it's not aggravated. It is extraordinary circumstances (sic). We have someone who not only lost his son but also lost his hand. Multiple gunshots were had.
>
> It wasn't even necessary to shoot anyone. They could've accomplished this robbery without shooting anyone it appears.

- 19 -

Which brings in – it appears that this was – the motive for this was because he was shorted a certain amount of marijuana and was ticked off about it. The proof was just as strong as to that as to anything else is what it appears to the Court, that this was perhaps in retaliation for being shorted. It was the reason to go over there. Since he'd bought from him before, why go over there and rob him unless you went there to rob him? If you went there just to buy, why would you show up with guns, you know. So the circumstances surrounding this offense are particularly aggravated. Multiple victims, children present. And so the aggregate length of the sentence is reasonably relate[d] to which [D]efendant stands convicted.

And it reasonably relates because, like I had indicated, . . . if you go somewhere with the intent to rob, you commit the robbery and someone dies as a result of that robbery, that's a murder first degree. He should have gotten life in prison. And so to say the minimum on this crime, that would be a personal affront to the decent, law abiding citizens of the – of Tennessee, to say he should be given the minimum under these circumstances. It's – that is almost – well, almost insulting.

The trial court denied Defendant's premature, but timely filed, motion for new trial. Defendant thereafter filed a timely notice of appeal.

**Analysis**

*I.       Exclusion of Six-Person Photographic Lineup Containing Defendant's Photograph.*

Defendant claims that the trial court's "all or nothing" ruling regarding Ms. Fett's prior identification evidence "lacked any basis in law" resulting in plain error. He argues that Ms. Fett's failure to identify him in a six-person photographic lineup should have been presented to the jury to refute her testimony that she had identified him. He also argues that the trial court should have addressed the admission of the Facebook images separately from the lineups. The State argues that the Defendant is not entitled to relief under plain error because admitting only the photo lineup where Ms. Fett failed to identify Defendant would have given the jury the false impression that she had lied during her testimony when she testified that she had identified him in a photo.

By arguing that he is entitled to relief under plain error, Defendant acknowledges that this issue was not properly preserved at trial. The record shows that while he initially argued that the lineup with his photograph should be admitted, he ultimately agreed with the State that it should not be introduced along with the Facebook images Ms. Fett used to identify him to the police. Defendant's agreement to the exclusion of all the prior

identification evidence and defense counsels' clear and repeated statement that "none of it" should come in, served to affirmatively waive plenary review. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

Thus, we will review this issue to determine whether Defendant is entitled to relief under plain error. Under the plain error doctrine, this court may grant relief on an unpreserved issue only if: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Bristol*, 654 S.W.3d 917, 929 (Tenn. 2022) (citing *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020)); *see also State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). The party seeking plain error relief bears the burden of satisfying all these factors. *Bristol,* 654 S.W.3d at 929 (citing *State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018)).

Decisions regarding the admission or exclusion of evidence are entrusted to the discretion of the trial court, and a trial court's ruling on evidence will not be disturbed absent an abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). The prior testimony of a declarant who is unavailable as a witness is admissible as an exception to the rule against admitting hearsay. Tenn. R. Evid. 804(a)(4), (b)(1); *State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009) (a witness's preliminary hearing testimony was "admissible under the 'former testimony' hearsay exception of Rule 804(b)(1) and . . . did not violate the defendant's rights under the Confrontation Clause"); *State v. Kibodeaux*, -- S.W.3d --, 2023 WL 6366218, at *13 (Tenn. Crim. App. Sept. 29, 2023) (reversing trial court order excluding preliminary hearing transcript of unavailable witness where the lack of discovery materials did not significantly impede the defendant's motive and opportunity to cross-examine the witness at the preliminary hearing).

In this case, the record suggests that the issue was waived for tactical reasons. One of Defendant's main theories at trial was that he was not armed with a gun. As the only witness to identify Defendant, Ms. Fett had to be believed on the issue of the gun. During closing argument, Defendant repeatedly argued that Ms. Fett did not see him with a gun. Therefore, excluding the Facebook images where she identified Defendant as the man who "bomb rushed" the house and fired "shots . . . outside" where Dontavious was killed suggests a strategic reason for agreeing to exclude them even if it meant excluding lineup #2. Indeed, the jury acquitted Defendant of the two weapons charges and convicted him of the lesser offense of reckless homicide instead of first degree murder.

- 21 -

Moreover, had lineup #2 and the Facebook images been introduced, Defendant's right to cross-examine Ms. Fett about the Facebook images would have been adversely affected given her death. As it stands, because Defendant chose to exclude lineup #2 and the Facebook images, his right to cross-examine Ms. Fett was not affected.

Because Defendant agreed that the photo lineup and the Facebook photos should not be introduced and the record indicates that Defendant agreed for tactical reasons, Defendant cannot establish plain error and is not entitled to relief.

## II.    *Sufficiency of the Evidence*

Defendant claims the evidence is insufficient to support his four felony convictions: aggravated assault, reckless endangerment, especially aggravated robbery, and reckless homicide. He argues that no evidence connected him to the crimes and that the evidence does not support his guilt on the theory of criminal responsibility because the jury acquitted Co-defendant White of all charges. The State argues the evidence supported the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. "A guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. Nov. 29, 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison*, 618 S.W.3d 24, 33 (Tenn. 2021.) The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison*, 618 S.W.3d at 33; *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021) (holding that the same standard of review applies when examining the sufficiency of the evidence and a motion for judgment of acquittal). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Allison*, 618 S.W.3d at 34; *Jones*, 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct

or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

In this case, the jury was instructed on criminal responsibility. "Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). A person is criminally responsible for the conduct of another if "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Under a theory of criminal responsibility, a defendant's presence, association, and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which a defendant's participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). Moreover, "it is no defense that: . . . The person for whose conduct the defendant is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or different type of class of offense, or is immune from prosecution." T.C.A. § 39-11-407(2).

### A. Aggravated Assault of Ashley Fett

Defendant claims the evidence is insufficient to support his conviction for aggravated assault because Ms. Fett never testified that she saw Defendant with a gun or saw Defendant use a gun to assault her. Defendant ignores the proof presented at trial that Co-defendant White assaulted Ms. Fett by firing his gun several times inside Charles's house and pointing the gun at Ms. Fett and her two children causing her to fear imminent bodily injury. Defendant argues that he cannot be criminally responsible for Co-defendant White's assault on Ms. Fett because the jury acquitted Co-defendant White of that charge. The State argues that the jury's decision to acquit Co-defendant White of aggravated assault does not entitle Defendant to relief because the evidence supports the conviction.

For aggravated assault, the State was required to show that Defendant committed an assault by "intentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury" involving the use or display of a deadly weapon. T.C.A. §§ 39-13-101(a)(2); 39-13-102(a)(1)(A)(iii). As stated previously, a person is criminally responsible for the conduct of another if "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2). The proof established Co-defendant White caused Ms. Fett to reasonably fear imminent bodily injury by firing multiple rounds in the house and aiming the gun in Ms. Fett's direction. *See State v. Miller*, 638 S.W.3d 136, 161 (Tenn. 2023) (holding the evidence sufficient to support

- 23 -

aggravated assault where proof established that defendant caused victim to reasonably fear imminent bodily injury by firing shot in victim's direction). Defendant places significance on Ms. Fett's testimony that she did not see him with a gun or see him point a gun at her. The jury heard the evidence, received instructions on lesser included offenses and criminal responsibility, and concluded Co-defendant White's act of pointing the gun at Ms. Fett and the bullets she felt grazing her legs while she ran to the back bedroom caused Ms. Fett to reasonably fear imminent bodily injury. We presume the jury followed the trial court's instructions, including the instruction on criminal responsibility. *State v. Banks,* 271 SW.3d 90, 137 (Tenn. 2008). The jury's decision to acquit Co-defendant White of this conviction does not entitle Defendant to relief. *See* T.C.A. § 39-11-407(2).

Additionally, the proof also established that Defendant assaulted Ms. Fett as the primary culpable offender. Defendant repeatedly points out that Ms. Fett testified that she did not see Defendant with a gun. While this is true, Charles testified that he was shot three times by two different men. The first gunman was a "bright-skinned" man who shot him with an assault rifle and blew his hand off and exited the house. He testified that a different man opened the front door of his house and fired his gun "nineteen to thirty" times, ultimately hitting him in his other hand and his leg. Ms. Fett testified that she grabbed her two children and fled to the back bedroom when the first gunman exited the house. However, she heard gunshots as she ran down the hallway and felt bullets "scrap[e]" her legs. She testified that the pants she was wearing at the time had bullet holes. From this evidence, it was reasonable for the jury to conclude that Defendant fired his weapon at Ms. Fett as she ran down the hallway to the back bedroom.

When viewed in the light most favorable to the State, the evidence was sufficient for any rational trier of fact to find that Defendant knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission such that Defendant was criminally responsible for the aggravated assault committed by Co-defendant White's use of a deadly weapon on Ms. Fett. Despite Ms. Fett's testimony that she did not see Defendant with a gun, the proof is also sufficient for the jury to have concluded that Defendant shot toward Ms. Fett as she fled with her children to the back of the house. Her testimony supports Defendant's conviction of aggravated assault. Defendant is not entitled to relief.

B.      *Reckless Endangerment of Ashley Fett's children, D.F. and A.C.*

Next, Defendant challenges his conviction for the reckless endangerment of D.F. and A.C., Ms. Fett's children. A person "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" commits reckless endangerment. T.C.A. § 39-13-103(a). If the reckless conduct is committed by

discharging a firearm into an occupied habitation, the reckless endangerment is a Class E felony. *Id.* § 39-13-103(b)(3).

Defendant recycles the same argument he employed for the aggravated assault conviction to challenge his reckless endangerment conviction. He argues that the evidence does not support this conviction because Ms. Fett identified Co-defendant White, not Defendant, as the person who fired his weapon multiple times inside Charles's house and aimed it at her children. As stated previously and contrary to Defendant's assertion, the evidence establishes Defendant's criminal responsibility for Co-defendant White's reckless endangerment of D.F. and A.C. notwithstanding the jury's decision to acquit Co-defendant White of reckless endangerment. Alternatively, the evidence legally supports a conclusion that Defendant was guilty of reckless endangerment as the primary offender. Resolving any conflicts in favor of the State, the proof demonstrated that after Co-defendant White exited the house, a second, "dark-skinned" gunman opened the front door and fired multiple rounds into the hallway, hitting Charles twice. As Ms. Fett ran down the hallway to the back bedroom with her two children, she felt the bullets graze by her legs and some of them actually penetrated the pants she was wearing, thereby endangering her two children "with imminent danger of death or serious bodily injury." The numerous shell casings found in the hallway are consistent with Ms. Fett's testimony and demonstrate that both Co-defendant White and Defendant put the two children in imminent danger of death or serious bodily injury. The proof at trial was sufficient for the jury to find Defendant guilty of reckless endangerment as the primary offender, or criminally responsible for the conduct of Co-defendant White. Defendant is not entitled to relief.

## C. *Especially Aggravated Robbery of Dontavious Craigen*

Defendant claims the evidence is insufficient to support his conviction for the especially aggravated robbery of Dontavious. He argues that there was no evidence that he took anything, Ms. Fett did not see him with a gun, and the proof does not show he caused Dontavious to suffer "serious bodily injury" or death as required under the statute. The State argues that the jury could reasonably have concluded that Defendant or Co-defendant White shot Dontavious while Co-defendant White took the marijuana and the gun from the dining room table, causing Dontavious to suffer serious bodily injury.

Especially aggravated robbery is defined as robbery "[a]ccomplished with a deadly weapon; and [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403. As relevant to this appeal, "robbery" is the "intentional or knowing theft of property of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "'Deadly weapon' includes [a] firearm[,]" and "[s]erious bodily injury means bodily injury that involves . . . [a] substantial risk of death[.]" *Id.* §§ 39-11-106(5)(A) (2018) (subsequently amended, renumbered); 39-11-106(34)(D) (2018) (subsequently amended, renumbered).

Viewing the evidence in the light most favorable to the State, Defendant created a diversion by forcing his way into the house after he was told to remain outside. A scuffle outside the house between Defendant and Dontavious ensued. Co-defendant White fired his weapon outside the house and then turned his weapon inside and fired it multiple times shooting Charles's fingers off. He then immediately grabbed the items off the dining table, including Dontavious's marijuana, put them in his backpack, and exited the house. A second man opened the door and fired multiple times hitting Charles twice. The neighbor saw a man armed with an assault rifle enter a gray Infiniti. Dontavious was found shot in the driveway behind Charles's truck. From this evidence, a reasonable jury could conclude that Co-defendant White committed theft of Dontavious's property with a deadly weapon. The ballistics evidence indicated that only one .308 spent shell casing was found at the scene which was the only one fired from the rifle used by Charles to defend himself. All other spent shell casings were of 7.26 by 39-millimeter caliber and were unlikely to have been fired from the .308 rifle, further debunking the defense theory that Charles shot Dontavious. Considering the facts in the light most favorable to the State, it was reasonable for the jury to conclude that during the theft, Co-defendant White or Defendant shot Dontavious causing an injury with "a substantial risk of death." Charles testified that both men were armed and fired the guns.

Defendant's argument that he did not rob Dontavious must fail because under the theory of criminal responsibility, the evidence demonstrates that Defendant acted with the intent to promote or assist in the commission of the robbery, or acted to benefit in the proceeds of the robbery. Defendant's text messages established that he arranged a meeting with Dontavious at Charles's house to purchase marijuana. The text messages further showed that Defendant believed Dontavious had shortchanged him on a prior purchase of marijuana. The text message did not indicate that Dontavious acknowledged the short or had any intent to reimburse Defendant. Defendant drove Co-defendant White to the location to meet Dontavious, he created a diversion for Co-defendant White to take the marijuana, and he covered Co-defendant White as he fled the house by shooting at Charles. *Cf. State v. Jenkins*, No. M2022-00693-CCA-R3-CD, 2023 WL 5813706, at *6-7 (Tenn. Crim. App. Sept. 8, 2023) (reversing defendant's second degree murder conviction where the proof did not support a finding that defendant acted with intent to promote the knowing killing of the victim by co-defendant but instead showed that they were "antagonists from the start, wholly adverse to each other in their respective intentions and actions"). Accordingly, Defendant fired a gun during the commission of the robbery and Dontavious suffered serious bodily injury resulting in death as a result of Defendant's actions. The evidence is sufficient for the jury to have found Defendant criminally responsible for the especially aggravated robbery of Dontavious by Co-defendant White.

### D. Reckless Homicide of Dontavious Craigen

Defendant claims the evidence does not support a conviction for reckless homicide because his identity as one of the two men who shot and killed Dontavious was not established at trial. Defendant posits that "[g]iven the acquittal of [Co-defendant] White, this Court cannot say that [Defendant] was found guilty by reason of criminal responsibility." As this court has stated previously in addressing the sufficiency of evidence supporting the other felony convictions, the jury's verdict of convicting Defendant while acquitting Co-Defendant White, however inconsistent or confounding, is not a basis for relief in Tennessee. *State v. Davis*, 466 S.W.3d 49, 72 (Tenn. 2015). "The rendering of inconsistent verdicts has always been an exclusive privilege and prerogative of the jury, and it is not our duty to unravel the ratiocinations of the jury's collective logic." *State v. Frye*, No. E2019-00686-CCA-R3-CD, 2021 WL 1971982, at *10 (Tenn. Crim. App. May 17, 2021), *perm. app. denied* (Tenn. Sept. 22, 2021) (quoting *Jackson v. State*, 477 S.W.2d 213, 216 (Tenn. Crim. App. 1971)). "[T]he question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached." *State v. Hamrick*, 688 S.W.2d 477, 481 (Tenn. Crim. App. 1985) (quoting *Jackson*, 443 U.S. at 320 n.13). Consequently, "verdicts as between two or more defendants tried together in a criminal case need not demonstrate rational consistency." *Pulley v. State*, 506 S.W.2d 164, 169 (Tenn. Crim. App. 1973) (affirming second degree murder conviction of one defendant although the proof "[u]nquestionably" showed both defendants were "equally guilty" of murder in the perpetration of robbery where both defendants participated and shared the loot).

Reckless homicide is the "reckless killing of another." *Id*. § 39-13-215(a). "'Like second degree murder, reckless homicide is a result-of-conduct offense.'" *State v. Davis*, 466 S.W.3d at 70 (quoting *State v. Parker*, 350 S.W.3d 883, 910 n.16 (Tenn. 2011)). Furthermore:

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(c).

Viewing the evidence in the light most favorable to the State, the proof established Defendant's presence in Charles's house at the time of the shooting. Defendant's text

messages to and from Dontavious established that Defendant arranged to purchase marijuana from Dontavious at Charles's house located at 1440 Wilson and arrived there at 4:41 p.m., just before gunshots were heard by a neighbor. Charles testified that he saw an unfamiliar, gray colored vehicle in the next door neighbor's driveway. That neighbor, Mr. Brownlee, testified that he saw a man with an assault rifle get into a gray Infiniti after he heard the gunshots next door. A speeding ticket issued to Defendant one month before the crimes, showed that Defendant owned an Infiniti matching the description of the car seen by Charles and Mr. Brownlee outside their respective homes at the time of the crimes. Based on this evidence, a reasonable juror could conclude Defendant drove to Charles's house in his gray Infiniti to purchase marijuana from Dontavious.

Contrary to Defendant's assertion, Ms. Fett identified both Defendant and Co-defendant White as the two men who initially took turns coming into Charles's house to buy marijuana from Dontavious. She identified Defendant in the courtroom among several people lined up near the door and also identified him by the tattoos on his hands which were displayed to the jury. She maintained that Defendant and Co-defendant White were together because when Defendant tried to enter Charles's house while Co-defendant White was still inside, she heard Dontavious tell Defendant, "You saw it (marijuana), you know what it looks like. He doesn't have to come in." From this proof, a reasonable jury could conclude Defendant was at Charles's house with Co-defendant White to purchase marijuana.

Ms. Fett testified that Co-defendant White fired his gun several times outside the house where Dontavious had pushed Defendant. Co-defendant White's conduct of firing his weapon nearby constituted reckless behavior creating circumstances whereby Dontavious was at risk of being shot. Indeed, the autopsy showed that Dontavious was shot in the back. A reasonable juror could infer that Dontavious was shot while Defendant and Co-defendant White were at Charles's house after Dontavious pushed Defendant out of the front door and that Defendant was united with Co-defendant White in the reckless homicide of Dontavious. Defendant had a motive to rob Dontavious; Defendant's act of barging into the house after he was told to remain outside while Co-defendant White was inside, created the opportunity for Co-defendant White to take the marijuana and fire his gun repeatedly in a manner "consciously disregard[ing] a substantial and unjustifiable risk" of death. T.C.A. § 39-11-302(c). We conclude that the evidence is sufficient to support Defendant's conviction for reckless homicide. Defendant is not entitled to relief.

### III.  *Sentencing*

Defendant claims the trial court based its sentencing decision on facts not found by the jury beyond a reasonable doubt when it "found that [Defendant] committed first degree murder by a preponderance of the evidence." Defendant argues that the trial court's

statement was contrary to the jury's verdict, constituting a violation of his Fifth and Sixth Amendment rights, citing *Blakely v. Washington*, 542 U.S. 296 (2004), *United States v. Booker*, 543 U.S. 220 (2005), and *Ring v. Arizona*, 536 U.S. 584 (2002). In support of his argument, Defendant points out that the trial court sentenced him to the maximum sentence in the range for each convicted offense and ran each count consecutively. The State contends that the trial court's comments did not nullify the jury's verdict and that Defendant's argument on constitutional grounds must fail because a trial court's application of advisory enhancement factors and imposition of consecutive sentences does not invoke Sixth Amendment concerns as outlined by *Blakely*, *Booker*, and *Ring*. The State adds that the trial court's sentencing decision is presumptively reasonable because all the sentences were within-range and consecutive sentencing was justified. For the reasons that follow, we affirm the sentence imposed by the trial court.

In 2005, our legislature amended the Sentencing Act such that "[i]f appropriate for the offense and if not themselves an essential element of the offense, the court shall consider, but is not bound by, the following advisory factors in determining whether to enhance a defendant's sentence." *See* Act of June 7, 2005, ch. 353, § 5, 2005 Tenn. Pub. Acts 788, 789 (codified at T.C.A. § 40-35-114 (2006)). The advisory nature of the sentencing guidelines and removal of presumptive sentences eliminated the Sixth Amendment concerns raised by *Blakely* and its progeny. *See State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008); *State v. Hester*, 324 S.W.3d 1, 69 (Tenn. 2010). Indeed, two years after the passage of the 2005 amendments, the United States Supreme Court expressly approved the statutory changes as constitutionally sound. *Cunningham v. California*, 549 U.S. 270, 294 n.18 (2007). Under the current Sentencing Act, trial courts may impose any sentence within the applicable range so long as the length of the sentence is consistent with the purposes and principles of the Sentencing Act. *State v. Bise*, 380 S.W.3d 682, 706-08 (Tenn. 2012).

Thus, a trial court may rely on enhancement factors not found by a jury in determining a defendant's sentence. *Carter*, 254 S.W.3d at 342-44; *see also Hester*, 324 S.W.3d at 69; *State v. Cross*, 362 S.W.3d 512, 528 (Tenn. 2012). Similarly, a trial court's decision to order consecutive sentences does not run afoul of Sixth Amendment concerns. *State v. Allen*, 259 S.W.3d 671, 689-90 (Tenn. 2008) (concluding that *Blakely* does not require a jury to determine the manner in which a defendant serves multiple sentences).

In sentencing Defendant for the reckless homicide conviction, the trial court commented that it found by a preponderance of the evidence that Defendant had committed first degree murder as charged in count one. However, the trial court recognized that it was constrained by the jury's verdict of reckless homicide and sentenced Defendant accordingly. The trial court's comments did not alter the jury's verdict or result in a sentence outside the proper range of punishment. Indeed, the record plainly shows that the

trial court imposed a within-range sentence for reckless homicide based on the application of five enhancement factors: Defendant had a previous history of criminal behavior, he was a leader in the commission of the offense involving himself and Co-defendant White, Defendant employed a firearm during the commission of the offense, Defendant had no hesitation about committing a crime when the risk to human life was high; and Defendant intentionally inflicted serious bodily injury upon a person other than the intended victim. T.C.A. § 40-35-114(1), (2), (9), (10), (12). Reckless homicide is a Class D felony. *Id.* § 39-13-215. The range of punishment for a Range I standard offender is two to four years. *Id.* § 40-35-112(a)(4). While the trial court improperly commented on facts not determined by the jury, the trial court did not impose a sentence beyond what could be lawfully ordered and the sentence imposed is consistent with the principals and purposes of sentencing. *See State v. Richmond*, M2021-01025-CCA-R3-CD, 2022 WL 4372220, at *12-13 (Tenn. Crim. App. Sept. 22, 2022) (holding harmless trial court's religious remarks during sentencing and affirming denial of an alternative sentence where the trial court stated that it would rule based on "the facts . . . and the rule of law, nothing else" and would exclude considerations about religion), *no perm. app. filed*; *State v. Taylor*, W2020-00437-CCA-R3-CD, 2021 WL 1546077, at *18-19 (Tenn. Crim. Apr. 20, 2021) (affirming defendant's twenty-five-year sentence for second degree murder although the trial court commented on defendant's gang affiliation before imposing the sentence where "nothing in the record" indicated the court relied on the affiliation in determining the sentence length but instead properly considered statutory criteria) *no perm. app. filed*. Thus, even if this court were to conduct a de novo review as requested by Defendant, Defendant is not entitled to relief.

The trial court was similarly constrained when sentencing Defendant on his other convictions. Indeed, the same presumption of reasonableness applies to the remaining felony convictions. The trial court sentenced Defendant to sentences within the proper range. Defendant was sentenced to twenty-five years for especially aggravated robbery, a Class A felony; *id.* §§ 39-13-403, -40-35-112(a)(1) (fifteen to twenty-five years); six years for aggravated assault, a Class C felony, *id.* §§ 39-13-102, -40-35-112(a)(3) (three to six years punishment for a Class C felony); and two years for reckless endangerment with deadly weapon, a Class E felony; *id.* §§ 39-13-103, -40-35-112(a)(5) (one to two years).

Defendant does not appeal the application of the enhancement factors but complains instead that the trial court erred in identifying Charles as a victim given that the jury acquitted Defendant of the attempted first degree murder of Charles. Because the trial court made detailed findings, we conclude that the presumption of reasonableness afforded to Defendant's sentence has not been overcome by this complaint. Charles was properly identified as a victim in enhancement factor ten because the evidence showed that Defendant had no hesitation about committing a crime where the risk to human life was high as demonstrated by the numerous shell casings found throughout Charles's house and the three gunshot wounds sustained by Charles resulting in the amputation of one of his

hands.  In addition, Charles was properly identified as "a victim or a person, other than the intended victim" of the felony as set forth in enhancement factor twelve.  T.C.A. § 40-35-114(12).  Accordingly, the trial court's application of this enhancement factor to the four felony convictions was not an abuse of discretion.  Moreover, the trial court was careful not to apply enhancement factor three to any of the convictions with clearly identified victims.  While we note that enhancement six is inapplicable to Charles, the misapplication of this enhancement factor does not remove the presumption of reasonableness of the trial court's sentencing decision.  *Bise*, 380 S.W.3d at 706-08 (holding that trial court's misapplication of sole enhancement factor did not remove the presumption of reasonableness of defendant's sentence).  The trial court heard and observed Charles as he testified and was in "a superior position" to this court in making its findings regarding the existence of enhancement factors three, ten, and twelve.  *State v. Winfield*, 23 S.W.3d 279, 284 (Tenn. 2000).  Defendant is not entitled to relief on this issue.

### IV.     *Excluded witness – Angela Lawson*

On appeal, Defendant claims the trial court erred in excluding Angela Lawson from testifying in violation of his Sixth Amendment right to call witnesses.  He argues that Ms. Lawson's testimony would have impeached Charles's testimony and "would have impacted the overall outcome of trial."  The State argues that the issue is waived because Defendant raises the issue as a constitutional claim for the first time on appeal.  Defendant replies that the issue in general was not waived because it was addressed at trial and properly raised in the motion for new trial and is entitled to plenary review.

First, we must determine the standard of review.  In his motion for new trial, Defendant argued that "[t]he [t]rial [c]ourt erred by not allowing the defense to call Angela Lawson, a rebuttal witness to impeach the testimony of state witness, Charles Craigen."  Defendant did not challenge the exclusion of Ms. Lawson's testimony on constitutional grounds.  Accordingly, we conclude that Defendant has waived consideration of this issue.  *See* Tenn. R. App. P. 36(a).  "An issue is waived if a party asserts a different position or argument on appeal."  *State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016); *Vance*, 596 S.W.3d at 253 (finding that waiver applies when a party objects at trial based on a non-constitutional ground and then asserts a constitutional ground for the objection post-trial); *see also State v. Robinson*, No. M2019-00303-CCA-R3-CD, 2020 WL 1923152, at *45 (Tenn. Crim. App. Apr. 21, 2020) (concluding that defendant's claim that the exclusion of witness testimony violated his constitutional right to present a defense and to confront witnesses were waived when defendant failed to raise the constitutional claims in the trial court), *perm. app. denied* (Tenn. Aug. 7, 2020); *State v. Lawson*, No. E2014-01788-CCA-R3-CD, 2015 WL 6083243, at *13 (Tenn. Crim. App. Oct. 16, 2015) (holding that defendant's constitutional claim challenging the admission of a recorded conversation was waived where it was presented for the first time on appeal).

Moreover, Defendant has not carried the burden of persuading this court that the trial court committed plain error. As stated previously, under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)).

After reviewing the record, we cannot reach the merits of Defendant's claim because no offer of proof was made. Thus, the record does not clearly establish what occurred in the trial court. *See* Tenn. R. Evid. 103(a)(2) ("[i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context"). The Supreme Court has explained that offers of proof are necessary for appellate review:

> In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit, this is done simply by having the exhibit marked for identification only and not otherwise introduced. *When, however, it consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible.*

*State v. Goad*, 707 S.W.2d 846, 852-53 (Tenn. 1986) (emphasis added). Accordingly, the party appealing the exclusion of evidence must make an offer of proof to enable the appellate court to determine whether the trial court's exclusion of the evidence was reversible error. *See State v. McCaleb*, 582 S.W.3d 179, 199 (Tenn. 2019) (holding that the State's failure to make an offer of proof regarding the excluded evidence precluded the trial court from making specific findings regarding the proposed testimony and precluded the appellate court from considering the issue). Had the issue not been waived for raising a constitutional claim for the first time on appeal, it would have been waived for failure to make an offer of proof. "[G]enerally, if an offer of proof [regarding an evidentiary ruling] is not made, the issue is deemed waived and appellate review is precluded." *State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997).

Defendant concedes that no offer of proof was made but suggests that defense counsel's statement summarizing Ms. Lawson's anticipated testimony is sufficient for this court's review. The record shows that after the State rested its case, a jury-out hearing was held to discuss Ms. Lawson's testimony. Defense counsel explained that Ms. Lawson had

dated Charles from 2012-2017, and was one of the two women who were on the scene after Dontavious and Charles had been shot before the police and ambulance had arrived. Defendant wanted to call Ms. Lawson to rebut Charles's testimony that he did not own a gun and that he was unaware that Dontavious sold marijuana out of his house. Defendant argued that Ms. Lawson's testimony was relevant to impeach Charles's credibility. The State argued that Ms. Lawson's proposed testimony was irrelevant because she was not present when the crimes occurred and because whether Charles knew that Dontavious was selling marijuana out of his house or that Dontavious was a drug dealer was not relevant to who shot whom. The trial court held that Ms. Lawson's testimony was inadmissible as extrinsic evidence under Rule 608 of the Tennessee Rules of Evidence. *See* Tenn. R. Evid. 608(a) ("The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked."). In doing so, the trial court held that Defendant was "stuck with [Charles's] answer" on whether he knew about marijuana being sold in his house or whether he ever owned a gun.

Upon the trial court's exclusion of Ms. Lawson as a witness, Defendant failed to make an offer of proof regarding the substance of her testimony. The record indicates that Ms. Lawson was in the courtroom and ready to testify. Without her testimony, the record does not establish what occurred at trial; there is nothing in the record for this court to review. Consequently, Defendant's failure to make an offer of proof regarding the substance of Ms. Lawson's testimony renders Defendant's claim for plain error review unsuccessful. Because the record is not adequate for us to determine whether the exclusion of Ms. Lawson's testimony was error, we conclude that granting plain error relief is not necessary to do substantial justice. Accordingly, Defendant is not entitled to relief on this issue.

## V. Reverse Batson Challenge

Defendant claims the "trial court erred in pressuring the parties to agree to a jury." Defendant argues that the trial court erred in granting the State's *Batson* challenge and denying his peremptory challenge to strike Juror 10. The State argues that the trial court properly granted the State's challenge because Defendant's reason for striking a juror was not race-neutral but a pretext for purposeful racial discrimination as evidenced by Defendant's pattern of striking Caucasian jurors.

"[T]here is a distinction between exercising a peremptory challenge to discriminate invidiously against jurors on account of race and exercising a peremptory challenge to remove an individual juror who harbors racial prejudice." *Georgia v. McCollum*, 505 U.S. 42, 59 (1992). Under the Equal Protection Clause of the Fourteenth Amendment, the State

shall not exercise a peremptory challenge to remove a prospective juror based solely on the juror's race. *Batson v. Kentucky*, 476 U.S. 79, 89-90 (1986). In *Georgia v. McCollum*, the United States Supreme Court applied *Batson* principles to the exclusion of jurors by criminal defendants. *See also J.E.B. v. Alabama*, 511 U.S. 127, 138-46 (1994) (extending *Batson* principles to gender discrimination). Thus, the State can make a "reverse *Batson* objection" to a defendant's peremptory challenge of jurors. *State v. Spratt*, 31 S.W.3d 587, 596 (Tenn. Crim. App. 2000) (quoting *State v. Hathaway*, No. 02C01-9702-CR-00082, 1997 WL 793505, at *6 (Tenn. Crim. App. Dec. 30, 1997)).

To invoke *Batson*, the State must first establish a prima facie case that a juror is being challenged on the basis of race. *Batson*, 476 U.S. at 93-94; *see also Johnson v. California*, 545 U.S. 162, 169 (2005); *Spratt*, 31 S.W.3d at 596. Circumstances to be considered include "any pattern of strikes, questions and statements during voir dire, and the recognized inference that peremptory challenges create an atmosphere which allows discrimination." *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 903 (Tenn. 1996) (citing *Batson*, 476 U.S. at 96-98).

Next, if the trial court determines that a prima facie showing of purposeful discrimination has been made, the defendant must then articulate a race-neutral explanation for the challenge. *Batson*, 476 U.S. at 97-98; *Spratt*, 31 S.W.3d at 596. The race-neutral explanation "does not need to be persuasive or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Unless purposeful discrimination is inherent in the explanation, the reason offered will be deemed race-neutral. *See id.*

Finally, the trial court must then determine, from all the circumstances, whether the State established purposeful discrimination. *See Batson*, 476 U.S. at 98; *Purkett*, 514 U.S. at 767. "The trial court may not simply accept a proffered race-neutral reason at face value but must examine the . . . challenges in context to ensure that the reason is not merely pretextual." *State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn. 2006) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)). "If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded." *Id.* at 369 (citing *Woodson*, 916 S.W.2d at 903).

When determining whether a *Batson* violation occurred, it is "imperative" for the trial court to articulate on the record whether a prima facie case has been established, whether a race-neutral explanation has been given, and whether the totality of the circumstances support a finding of purposeful discrimination. *Spratt*, 31 S.W.3d at 596; *see also Woodson*, 916 S.W.2d at 906. The trial court's findings are to be accorded great deference and not set aside unless clearly erroneous. *Woodson*, 916 S.W.2d at 906; *see also State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). "[T]he exercise of even one

- 34 -

peremptory challenge in a purposefully discriminatory manner would violate equal protection." *State v. Ellison*, 841 S.W.2d 824, 827 (Tenn. 1992).

Our examination of the trial court's application of *Batson* reveals no error. In this case, the trial court determined that the State had established a prima facie case of purposeful discrimination by Defendant in striking Juror 10. The transcript reveals that before moving to strike Juror 10, Defendant moved to strike Juror 4, prompting the State to lodge an objection and demanding Defendant's reasons for striking Juror 4. The State noted that in "the last few rounds" Defendant had "systematically" struck Caucasian women. At that point, Defendant had used nine of his twelve strikes to eliminate Caucasian jurors.[6] Defense counsel responded that she lacked "a connection" with Juror 4 who also "seemed hostile" and had served in a federal trial and denied that Juror 4 was being challenged because "she's white." The trial court then found that Caucasian women were systematically being struck from the jury. "In counting up the [twelve], two, four, six, eight, ten, [twelve] strikes I believe made by the defense. In counting[,] nine of them are Caucasian people. And it seems like the last few rounds it's been systematically going through the Caucasian women." Although the trial court did not find the explanation to be race-neutral, the court excused Juror 4. In the next round of challenges, defense counsel approached the bench and informed the trial court that Defendant wanted to strike Juror 10, "another female white," because Defendant believed her to be "hostile." The trial court denied the request to strike Juror 10.

After the jury was excused, the trial court addressed Defendant's challenge to Juror 10. The trial court observed that the jury was "mostly African-American" and that "almost every female white [was] excluded" other than Juror 10. The trial court concluded that there was not a race-neutral reason for Defendant to strike Juror 10:

> But I really heard no race neutral basis for that and so I just wanted the record to be clear so he would understand that having a female white on the jury is not going to cause him any more or less chances of being convicted. It's going to depend upon the proof that comes from the witness stand and the law and the common sense and so that's what we're going to base – what they're going to base it upon.

"[A] prima facia case of purposeful discrimination may be established solely on evidence relating to the exercise of peremptory challenges so long as the evidence gives rise to an inference of discriminatory purpose." *State v. Talley*, No. W2003-02237-CCA-R3-CD,

---

[6] It appears the State was referring to both strikes for cause and peremptory strikes. The State noted further that by that point, it had exercised four peremptory challenges, Defendant had exercised six, and Co-defendant White had exercised five.

2006 WL 2947435, at *9 (Tenn. Crim. App. Oct. 16, 2006). "While a pattern of strikes against a particular racial group is not required to prove discrimination, it certainly is significant because it may give rise to the inference of discrimination." *Id.*

We conclude that the trial court did not err in its application of *Batson*. After observing the racial composition of the venire and the circumstances involved in peremptory challenges, the trial court determined that purposeful discrimination had occurred . *See Talley*, 2006 WL 2947435, at *9. Although *Batson* provides the party objecting to the *Batson* challenge to give a reason for striking a juror, "it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 241. Accordingly, we find that there was no "clear indication that the trial court erroneously applied *Batson*" to deny Defendant's challenge to Juror 10. *Talley*, 2006 WL 2947435, at *9.

Furthermore, Defendant failed to present any evidence that the jury in his case was not fair and impartial. At the hearing on the motion for new trial, the State's co-counsel stated that it took "[a] long time" to select the jury but nothing further was said. On appeal, Defendant claims that the trial court "pressur[ed] the parties to agree to a jury" due to the length of voir dire. Defendant points out that voir dire began at two in the afternoon and continued until seven in the evening. The trial court recalled that the State lodged its challenge toward the end of voir dire but denied a new trial as to the selection of the jury:

> So if this was towards the end of the evening and we would have had to reseat a bunch of people or even call for more – or hold it over to the next day for no reason whatsoever. That's something that I don't know if the Court of Criminal Appeals ever looked at that. You know here it is, you know, we're torturing these people making them sit through voir dire and I say that sort of tongue and cheek, but you know, listening to the same questions over and over again and then you have people that appear to be – and matter of fact were very fair and impartial. They acquitted one of the guys. And then they found [Defendant] guilty of a much lesser offense.
>
> So and it appears they put a lot of thought into this collectively as a jury. So[,] to say these two people weren't fair and impartial is really – I don't know. That's making a jump that's – that's really not based in any facts whatsoever. So anyway, I don't really, you know, of course, I have this same objection on almost every jury trial where there's a reverse *Batson*. It's usually late and it's usually for no reason other than they're white. And we would have had to probably call for more jurors or stuff like that so and they also had a constitutional right to be on there and I think they did their job and they did it well.

- 36 -

Defendant suffered no prejudice from the granting of the State's challenge regarding Juror 10 as evinced by the verdict. Defendant is not entitled to relief on this issue.

## VI.    *Cumulative Error*

Defendant contends that he is entitled to relief under the cumulative error doctrine. The cumulative error doctrine recognizes that there may be many errors, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant relief under the cumulative error doctrine, there must have been more than one actual error committed during the trial proceedings. *Id.* at 77. Here, we need not consider the cumulative effect of any alleged errors because Defendant has failed to demonstrate multiple errors, much less a single error in any of his issues. *See also State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.


_____

JILL BARTEE AYERS, JUDGE

- 37 -